UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
CIVIL ACTION NO.: 7:22-cv-00116

| | |
|---|---|
| DM CONSULTING PARTNERS, LLC, a Texas limited liability company, and DARYL MILLAR<br><br>Plaintiffs,<br>v.<br><br>MARPAC, LLC, a North Carolina limited liability company, and JAMES B. SLOAN, Jr.<br><br>Defendants. | COMPLAINT AND<br>DEMAND FOR JURY TRIAL |

Plaintiffs, DM Consulting Partners, LLC ("DM Consulting") and Daryl Millar ("Millar") (together "Plaintiffs"), by and through counsel, bring this action against Defendants MARPAC, LLC ("MARPAC") and James B. Sloan, Jr. ("Sloan") (together "Defendants"), and allege as follows:

## NATURE OF PLAINTIFF'S CLAIMS

1. Sloan, the Chief Executive Officer ("CEO"), Managing Member, and majority owner of MARPAC, devised and knowingly carried out a scheme designed to (1) remove Millar from his position of Chief Growth Officer for MARPAC without cause, and (2) force DM Consulting to sell MARPAC its minority ownership interest in MARPAC for an amount significantly less than fair market value. Sloan's actions constitute a breach of the implied covenant of good faith and fair dealing that Sloan owed to Millar and DM Consulting, and a breach of the fiduciary duties Sloan owed to DM Consulting. Sloan also tortiously interfered with Millar's Employment Agreement by terminating Millar's employment with MARPAC for

Sloan's personal benefit, which decision was made in bad faith and adverse to the MARPAC's interests.

2. MARPAC breached its Employment Agreement with Millar by mischaracterizing the termination of Millar's employment with MARPAC as "for cause."

3. MARPAC breached its January 15, 2020, and January 1, 2021, Membership Award Agreements with DM Consulting by mischaracterizing the termination of Millar's employment with MARPAC as "for cause."

## THE PARTIES

4. Plaintiff Millar is an adult individual who is a resident of Austin, Texas.

5. Plaintiff DM Consulting is a Texas limited liability company with its principal place of business in Austin, Texas.

6. MARPAC is a North Carolina limited liability company registered and in good standing in the State of North Carolina, located at 2015 Capital Drive, Wilmington, North Carolina, 28405.

7. Sloan is a resident of North Carolina and the CEO, Managing Member, and majority owner of MARPAC. In this capacity, Sloan acted and had responsibility to act on behalf of, and in the interests of MARPAC, in devising, directing, implementing, and supervising the issues raised in this lawsuit.

## JURISDICTION AND VENUE

8. This Court has diversity jurisdiction under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and because Plaintiffs and Defendants are citizens of different states.

9. This Court has personal jurisdiction because Defendants conduct business in New Hanover County, North Carolina, which is located within this judicial district.

10. Venue is proper in this judicial district because Defendants have substantial business contacts in this district and because the unlawful acts alleged herein occurred in New Hanover County, North Carolina.

11. All of the alleged causes of action can be determined in this judicial proceeding and will provide judicial economy, fairness, and convenience for the parties.

## PLAINTIFF'S FACTUAL ALLEGATIONS

12. MARPAC manufactures and sells sleep and bedding products under the retail name Yogasleep.

13. MARPAC hired Millar as Vice President of Digital in January 2019. Millar reported directly to Sloan.

14. MARPAC promoted Millar to Chief Growth Officer in January 2021. As Chief Growth Officer, Millar was responsible for the following MARPAC teams: product management, business development, global sales, marketing, consumer data and analytics, brand and creative, direct to consumer, and customer experience.

15. As a result of Millar's direction and leadership initiatives, MARPAC's profits increased by +170%, and its sales increased +120% since Millar was appointed Chief Growth Officer.

16. Although Sloan enjoyed the title of CEO, during Millar's tenure with MARPAC Sloan delegated the oversight and management of MARPAC's day-to-day operations to Millar, Terry Hollingsworth (Chief Operating Officer), and Michael McMannus (CFO).

17. Since Millar was appointed Chief Growth Officer, Sloan has tasked Millar with leading key initiatives, including developing MARPAC's growth strategy, managing monthly business reviews, and leading executive management team meetings.

18. During 2021 and 2022, Millar and Sloan have had several discussions regarding succession planning, including but not limited to promoting Millar to CEO or a similar high-level leadership position.

19. Millar has never misrepresented his role, job title, or responsibilities as an employee of MARPAC to any person or entity.

20. On January 1, 2021, MARPAC and Millar executed an Employment Agreement, whereby MARPAC agreed to pay certain severance benefits in the event MARPAC voluntarily terminated Millar's employment. A true and accurate copy of the Employment Agreement is attached hereto as Exhibit 1.

21. On January 25, 2020, MARPAC and DM Consulting executed a Membership Award Agreement whereby MARPAC granted DM Consulting a three percent (3%) equity ownership interest in MARPAC. Millar and DM Consulting do not have a copy of the January 25, 2020, Membership Award Agreement. MARPAC and/or Sloan maintain custody and control of the executed January 25, 2020, Membership Award Agreement.

22. On January 1, 2021, MARPAC and DM Consulting executed a Membership Award Agreement whereby MARPAC granted DM Consulting an additional three percent (3%) equity ownership interest in MARPAC. A true and accurate copy of the January 1, 2021 Membership Award Agreement is attached hereto as Exhibit 2.

23. Millar is the sole member of DM Consulting and holds a 100% ownership interest.

24. Under the January 25, 2020 and January 1, 2021 Membership Award Agreements (together "Membership Award Agreements"), DM Consulting currently owns a four percent (4%) vested ownership interest in MARPAC and holds a two percent (2%) unvested ownership interest in MARPAC.

25. In the Fall of 2021, Sloan informed the MARPAC executive management team, including Millar, that he intended to sell a portion of his interest in MARPAC.

26. In November 2021, MARPAC began discussions with an investment firm to sell Sloan's majority ownership share of MARPAC.

27. Between November 2021 and June 2022, the investment firm engaged in due diligence regarding the potential purchase. During this period, the investment firm conducted several meetings with the MARPAC's executive team, reviewed MARPAC's financials, and observed MARPAC's day-to-day business. Millar was a primary contributor to both the preparation of materials as well as helping to lead the meetings with the investors during the due diligence process. In addition, certain members of the investment firm previously held an ownership interest in MARPAC, which they sold to Sloan in 2018, prior to Millar's employment with MARPAC. On several occasions, these individuals commented and complimented the substantial changes and improvements Millar had implemented within the company.

28. On June 29, 2022, a member of the investment firm (the "Representative") requested to meet with Millar in Austin, Texas. The Representative informed Millar that the investment firm was interested in purchasing Sloan's majority ownership share in MARPAC, but they needed to finalize the details of the leadership of the company. Throughout the due diligence process, they saw the impact and improvements Millar made on the company since they exited their investment in MARPAC in 2018. The Representative ended the meeting by

stating the investment firm intended to speak with Sloan the following day regarding the leadership of the company.

29. Upon information and belief, Sloan and the investment firm met during the first week of July 2022 and Sloan learned that the investment firm desired to purchase his majority ownership share in MARPAC but questioned who was truly leading the company.

30. On July 7, 2022, Sloan sent an email to the MARPAC executive team and key leaders in the company stating that the investment firm "had pulled out of the investment in MARPAC," but that Sloan would be meeting with the investment firm the following week.

31. On July 11, 2022, Sloan notified Millar that his employment with MARPAC was terminated effective immediately.

32. Later on July 11, 2022, Millar received a letter from MARPAC's legal counsel. The letter falsely alleged:

> As you know, CPC proposed to purchase a majority stake in the Company pursuant to a formal indication of interest. CPC and the Company spent a significant amount of time and effort in due diligence and professional fees and expenses. During that process, you intentionally misrepresented yourself to CPC representatives as the acting Chief Executive Officer "running the Company" and attempted to convince CPC that Jimmy Sloan, the Company's actual CEO and majority owner, had ceased to have any meaningful involvement with the Company. The only reasonable inference that can be drawn is that you sought to improve your own position and standing with CPC by overstating your own importance, thereby breaching your fiduciary duty to the Company.
>
> Your representations to CPC backfired. They caused CPC's commitment to the contemplated transaction to waver and ultimately CPC disengaged from it. In the most basic and readily understandable terms, you have cost the Company and its members a great deal of money by chasing away a very good and lucrative business opportunity.

33. The letter stated further: "the Company provides you notice that it terminates your employment for cause and intends to pay you only your accrued but unpaid salary through

6

today's date and to pursue all available legal and equitable remedies to recover the damages you caused."

34. Millar did not make any representations to the investment firm that constitute a breach of Millar's Employment Agreement.

35. Millar did not engage in any conduct that constitutes a breach of Millar's Employment Agreement.

36. Upon information and belief, Sloan's representation that the investment firm "had pulled out of the investment in MARPAC," was false and MARPAC and the investment firm are still negotiating for the purchase of Sloan's majority ownership share of MARPAC, pending resolution of the leadership of the company.

## FIRST CAUSE OF ACTION

**BREACH OF CONTRACT – EMPLOYMENT AGREEMENT**
**(Against MARPAC only)**

37. Plaintiffs allege and incorporate by reference each of the preceding paragraphs of this Complaint as though fully set forth herein.

38. On January 1, 2021, MARPAC and Millar executed the Employment Agreement, where MARPAC agreed to pay certain lucrative severance benefits in the event MARPAC voluntarily terminated Millar's employment.

39. MARPAC breached its Employment Agreement with Millar by intentionally and falsely characterizing Millar's termination of employment as "for cause." By falsely characterizing Millar's termination of employment as "for cause," MARPAC seeks to avoid its contractual obligation to pay severance and other benefits to Millar as required by the Employment Agreement

7

40. As a direct and proximate cause of MARPAC's breach, Millar suffered damages in an amount to be established at trial.

## SECOND CAUSE OF ACTION

### BREACH OF CONTRACT – MEMBERSHIP AWARD AGREEMENTS
(Against MARPAC only)

41. Plaintiffs allege and incorporate by reference each of the preceding paragraphs of this Complaint as though fully set forth herein.

42. On January 25, 2020, MARPAC and DM Consulting executed a Membership Award Agreement whereby MARPAC granted DM Consulting a three percent (3%) equity ownership interest in MARPAC.

43. On January 1, 2021, MARPAC and DM Consulting executed a Membership Award Agreement whereby MARPAC granted DM Consulting an additional three percent (3%) equity ownership interest in MARPAC.

44. The January 25, 2020, and January 1, 2021, Membership Award Agreements (hereinafter referred to together as "Membership Award Agreements") require MARPAC to repurchase DM Consulting's vested and unvested interests in the event MARPAC is sold or Millar's employment with MARPAC is terminated.

45. The Membership Award Agreements provide the formulas by which the value of DM Consulting's vested, and unvested shares shall be calculated, depending on whether MARPAC is sold, Millar's employment with MARPAC is terminated without cause, or Millar's employment with MARPAC is terminated "for cause." Under the formulas set forth in the Membership Award Agreements, the value of DM Consulting's vested, and unvested shares is significantly lower if Millar's employment with MARPAC is terminated "for cause."

46. DM Consulting currently holds a four percent (4%) vested equity ownership interest in MARPAC and a two percent (2%) unvested equity ownership interest in MARPAC.

47. MARPAC breached its Membership Award Agreements with DM Consulting by falsely characterizing Millar's termination of employment as "for cause." Under the Membership Award Agreements, the termination of Millar's employment "for cause" results in MARPAC repurchasing DM Consulting's minority ownership interest for an amount that is significantly less than fair market value.

48. As a direct and proximate cause of MARPAC's breach, Millar suffered damages in an amount to be established at trial.

## THIRD CAUSE OF ACTION

### BREACH OF FIDUCIARY DUTY
**(Against Sloan only)**

49. Plaintiffs allege and incorporate by reference each of the preceding paragraphs of this Complaint as though fully set forth herein.

50. During the relevant period described above, Sloan was Chief Executive Officer of MARPAC, owned a majority ownership interest in MARPAC, and was the sole Manager of MARPAC. In each of these positions and roles, Sloan owed fiduciary duties to DM Consulting and Millar under N.C. Gen. Stat. § 57D-3-21, including, but not limited to, the duties of care, loyalty, and good faith.

51. Sloan breached his fiduciary duties through the conduct alleged above, both by failing to act in good faith and with due regard to DM Consulting's and Millar's interests, and by affirmatively acting in bad faith and with conscious, willful, and intentional disregard for his

duties and DM Consulting's interests, as well as Millar's interests, by falsely characterizing the termination of Millar's employment with MARPAC as "for cause."

52. Sloan stands to benefit personally and financially from his breach of fiduciary duties because by characterizing the termination of Millar's employment with MARPAC as "for cause," MARPAC is entitled to repurchase DM Consulting's vested and unvested ownership interest in MARPAC for a below market value amount. Ownership of the repurchased equity interest reverts to Sloan.

53. Sloan's breach of his fiduciary duties to DM Consulting proximately caused DM Consulting substantial financial damages, in an amount to be proven at trial.

54. Sloan's breach of his fiduciary duties to Millar proximately caused Millar substantial financial damages, in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION

### Breach of Implied Covenant of Good Faith and Fair Dealing
### (Against Sloan only)

55. Plaintiffs allege and incorporate by reference each of the preceding paragraphs of this Complaint as though fully set forth herein.

56. As a party to the Membership Award Agreements, Sloan owed DM Consulting an implied covenant of good faith and fair dealing.

57. Sloan's mischaracterization of the reason for Millar's termination of employment as "for cause," which triggers DM Consulting's obligation to sell its minority ownership interest to MARPAC for below market value, constitutes a breach of the implied covenant of good faith and fair dealing.

58. DM Consulting has suffered harm based on Sloan's actions because Sloan's decision to characterize Millar's termination of employment as "for cause" is untrue and

motivated by Sloan's improper personal interests.  If Sloan had not breached his implied covenant of good faith and fair dealing, DM Consulting would be entitled to receive a much higher purchase price for its minority ownership interest following the termination of Millar's employment.

59. Sloan's breach of his implied covenant of good faith and fair dealing to DM Consulting proximately caused DM Consulting substantial financial damages, in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION

### TORTIOUS INTERFERENCE WITH CONTRACT
**(Against Sloan only)**

60. Plaintiffs allege and incorporate by reference each of the preceding paragraphs of this Complaint as though fully set forth herein.

61. As CEO and Managing Member of MARPAC, Sloan was aware of the Employment Agreement between Millar and MARPAC.

62. Sloan intentionally interfered with MARPAC's contractual relationship with Millar by mischaracterizing Millar's termination of employment as "for cause."

63. Sloan's decision to falsely assert that Millar engaged in misconduct rising to the level of a "for cause" termination was motivated by Sloan's improper personal interests, including financial gain and to inflict reputational harm on Millar.

64. Sloan's conduct was willful, wanton, malicious, and oppressive, and thus justifies awarding exemplary and punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand the following relief:

a) Grant a trial by jury on all causes of action so triable;

b) Award Plaintiffs their actual damages in an amount to be determined at trial;

c) Award Plaintiffs punitive damages;

d) Tax all costs of this action to Defendants; and

e) Award or Order such other and further relief as may be necessary and appropriate.

Respectfully submitted this 27th day of July 2022.

/s/ Philip J. Gibbons, Jr.
Philip J. Gibbons, Jr., NCSB #50276
Corey M. Stanton, NCSB #56255
**GIBBONS LAW GROUP, PLLC**
14045 Ballantyne Corporate Place, Suite 325
Charlotte, NC 28277
Telephone: (704) 612-0038
Facsimile: (704) 612-0038
Email: phil@gibbonslg.com
corey@gibbonslg.com

*Attorneys for Plaintiffs*