# EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT ("*Agreement*") is made as of this 1 day of January, 2021, by and between MARPAC, LLC, a North Carolina limited liability (the "*Company*"), and DARYL MILLAR, who currently is a resident of Austin, Texas ("*Employee*").

## RECITALS:

A.  Employee is currently employed by the Company as its Chief Growth Officer, pursuant to an Employment Agreement dated January 19, 2019 (the "*Prior Employment Agreement*").

B.  The Company and Employee wish to terminate the Prior Employment Agreement, and replace it with this Agreement, under the terms of which Employee will enjoy a significant increase in compensation and benefits.

C.  Employee is a valued key employee who will be provided with valuable confidential and proprietary information of the Company and will have significant managerial responsibilities for the Company.

D.  The parties acknowledge that the Company has a legitimate interest in requiring Employee to be bound by the covenants set forth herein in order to preserve the goodwill, customer relationships and value of the business to be handled by Employee.

**NOW, THEREFORE,** in consideration of the foregoing recitals and of the mutual promises hereinafter contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Employee and the Company agree as follows:

## ARTICLE 1
## EMPLOYMENT AND DUTIES

1.1  Employment. The Company hereby employs Employee and Employee hereby accepts such employment upon the terms and conditions hereinafter provided.

1.2  Duties and Position. Employee shall serve as Chief Growth Officer of the Company and shall report to the CEO/President of the Company. The nature of Employee's duties and responsibilities, the manner in which those duties are to be performed, and the time of performance shall be subject to the supervision, direction and control of the CEO/President, including the power to: (a) specify Employee's principal tasks and job functions in a written job description, which may be amended from time to time; (b) determine the assignment of work to Employee; and (c) establish work schedules which prescribe the days, hours and places for the performance of Employee's duties hereunder.

1.3  Extent of Services. Employee agrees to devote Employee's full business time and attention (not less than 40 hours per week) exclusively to the performance of services on behalf of the Company, not to engage in any outside employment or consulting activities without Company's written consent, and to use Employee's best efforts to faithfully carry out Employee's duties and responsibilities hereunder. In the performance of Employee's duties hereunder, Employee agrees to follow and abide by (i) all applicable laws, regulations, rules and ordinances, and (ii) all personnel policies, rules, regulations and procedures of the Company as the same now exist or may be hereafter implemented.

300658

1.4     Location. Employee shall be located and based in Austin, Texas. Employee understands that his position will require travel for the effective performance of his duties and agrees to travel as necessary to perform the duties of his position.

## ARTICLE 2
## TERM OF EMPLOYMENT

Employee's term of employment with the Company under this Agreement shall commence on January 1, 2021 and shall continue in effect until terminated in accordance with the provisions of Article 4.

## ARTICLE 3
## COMPENSATION AND BENEFITS

3.1     Salary and Bonus.

(a)     Base Salary. The Company shall pay Employee as compensation for all services rendered an annual salary of $225,000 (the "*Base Salary*"). The Base Salary shall be paid in accordance with the Company's normal payroll cycle for salaried employees. The Base Salary shall be pro-rated for any partial Calendar Year if employment starts or ends other than on the first or last day of the Calendar Year.

(b)     Discretionary Year End Bonus; One-Time Retention Bonus. In addition to the Base Salary, Employee is eligible to receive discretionary year-end bonuses of up to 40% of Base Salary based on the performance of the Employee and the Company in accordance with key performance indicators/criteria ("*KPIs*") established by the Managers of the Company on an annual basis. Any such discretionary bonus shall be paid at the end of the first quarter following conclusion of the Calendar Year then in effect. If Employee is not employed by the Company at the conclusion of any Calendar Year, Employee shall forfeit entitlement to the discretionary year- end bonus. In addition to the Base Salary and discretionary year-end bonuses, if Employee remains a full-time employee of the Company through December 31, 2023 and achieves Employee's KPIs in each of the Calendar Years 2021, 2022 and 2023, then the Company shall pay Employee a one-time cash bonus (the "*Retention Bonus*"), no later than March 15, 2024, in the amount of $75,000. If Employee does not remain a full-time employee through December 31, 2023 or fails to achieve Employee's KPIs in any of the Calendar Years 2021, 2022 or 2023, then Employee shall forfeit any entitlement to the Retention Bonus.

3.2     Paid Leave. For each Calendar Year in which this Agreement is in effect, pro-rated for any partial Calendar Year, Employee shall receive 240 hours (30 days) of paid personal leave for vacation, sickness or other reasons.  Such paid personal leave shall be in addition to paid holidays identified in the Marpac Employee Handbook. Unused paid leave in any Calendar Year may not be carried forward, and no payment will be made for accrued but unused paid leave. The date or dates upon which the paid leave time may be taken (with the exception of sick leave) shall be subject to the Company's prior approval. Upon termination, no payment will be made for accrued but unused paid leave.

3.3     Participation in Benefit Plans. Employee shall be eligible to participate in and receive benefits under such employee and welfare benefit plans as may be established from time to time by the

Company for the benefit of all of its employees generally, including any health insurance, disability insurance, life insurance, profit-sharing or pension plans, subject in each instance to Employee meeting all eligibility and qualification requirements of such plans. The Company reserves the right to make changes to such benefit plans as the Managers of the Company, in their sole discretion, deem appropriate.

       3.4     Travel and Other Business Expenses. The Company will reimburse Employee for all reasonable, ordinary and necessary business expenses (including travel expenses) incurred or paid by Employee in the performance of Employee's services under this Agreement provided (i) such expenses are approved in advance by the Company, (ii) Employee complies with the Company's expense reimbursement policies, and (iii) Employee presents proper expense statements or vouchers or such other written supporting documentation as the Company may reasonably require.

       3.5     Other Fringe Benefits. During the term of employment, as additional compensation to Employee, the Company shall (a) provide Employee with a laptop computer and desktop docking station, (b) pay or reimburse Employee's monthly cell phone and internet charges up to a total of $200 per month, (c) pay Employee a car allowance of $500 per month, (d) pay or reimburse Employee for the annual premium of a basic ten-year level term life insurance policy insuring Employee (including accidental death and dismemberment) with a $1,000,000 face value, (e) pay or reimburse Employee for medical coverage for Employee + spouse/partner and pay or reimburse Employee for supplemental medical insurance, including concierge service (e.g. Duke Signature Care/Austin Medical Partners, etc.), (f) pay or reimburse Employee for a long-term income disability policy on Employee at annual cost not to exceed $5,000, and (g) provide Employee with a corporate credit card for use in payment of reasonable travel and business expenses incurred by Employee in performance of his duties and as permitted by this Agreement.

       3.6     Withholdings. Employee acknowledges and agrees that the Company may withhold any amounts necessary from Employee's compensation to comply with the provisions of any applicable laws or regulations, including but not limited to withholding income taxes, payroll taxes, amounts authorized to be withheld by Employee (e.g., for insurance or other benefits), and all other amounts required by law or regulation to be withheld.

## ARTICLE 4
## TERMINATION

       4.1     Termination of Employment. Employee's employment will be terminated, effective on the date indicated, upon the happening of any of the following events:

       (a)     Death of Employee, effective as of the date of death.

       (b)     Any breach or default in performance of any of Employee's duties or obligations hereunder in any material respect, effective immediately upon the Company's giving written notice of termination; provided, however, that the Company shall give Employee written notice of any breach or default hereunder and twenty (20) days within which to cure such breach or default (or commence diligent efforts to cure, if the breach or default is not reasonably capable of being cured in twenty (20) days) before exercising its right of termination hereunder. The Company shall be required to give Employee an opportunity to cure only one time as to the same type of breach or default.

(c) Termination "for cause" by the Company, effective immediately upon giving written notice of termination to Employee. Termination "*for cause*" shall mean any one of the following:

1. Employee's willful misconduct in the performance of Employee's duties;

2. Employee's willful failure to observe or willful violation of any material policy described in the Marpac Employee Handbook;

3. Employee is involved in the unauthorized use of alcohol or any controlled substance during working hours or uses alcohol or controlled substances during non-working hours in a manner that adversely affects Employee's job performance, Employee's ability to fulfill the responsibilities under this Agreement, or the safety of Employee or others;

4. Employee is charged or convicted of a felony or crime of moral turpitude;

5. Employee engages in any act of fraud, embezzlement, theft, unethical or dishonest conduct, or any conduct which is materially injurious to the economic interests, business goodwill or reputation of the Company;

6. Employee makes a willful misrepresentation of a material fact to any member of the Company's management; or

7. Employee fails to comply with a reasonable written order of the Company's management.

(d) The "Disability" of Employee, effective immediately upon giving written notice of termination to Employee. Employee shall be deemed to have a "*Disability*" or be "*Disabled*" when Employee suffers from a mental or physical disability of such magnitude and effect that Employee is unable to perform the essential functions of Employee's job, notwithstanding any reasonable accommodation the Company is obligated by law to extend. The Disability shall be deemed to have occurred on (i) the date the Company and Employee agree in writing that Employee is Disabled, or (ii) the date of Disability specified in a written certification of Employee's Disability from Employee's personal physician (or, if Employee has none or the Company requests a second opinion, then from any licensed physician designated by the Company) following a request for same by the Company or (iii) if Employee refuses to supply the written certification or to be examined for that purpose within forty-five (45) days of the Company's written request for the certification, the date of expiration of such forty-five (45) day period. In the event the Company disputes the findings of Employee's personal physician regarding Employee's Disability, the Company reserves the right to require Employee to submit to an independent medical examination, and such examination shall be determinative on the issue of Employee's disability and the date thereof.

(e) Voluntary termination of employment by either party upon the giving of thirty (30) days written notice to the other party, effective upon the date specified in such notice. The Company shall have the option of requiring Employee to continue to perform services through the date of

termination or the Company may terminate Employee's employment immediately and pay Employee for the balance of the thirty (30) day period not worked.

(f) Termination by the Employee for "Good Reason" upon the giving of thirty (30) days written notice to the Company. For purposes of this Agreement, "*Good Reason*" shall mean any of the following events which occur in connection with the closing of a Sale Transaction (as defined in the Company's Operating Agreement) that also constitutes a Section 409A Change in Control (defined below): (i) a material reduction in Employee's Base Salary or benefits; (ii) the relocation of Employee's principal place of employment by more than 25 miles; or (iii) a material adverse reduction in Employee's title, authority, duties or responsibilities. For purposes of this Agreement, a "*Section 409A Change in Control*" shall mean a Sale Transaction that satisfies the requirements of Treasury Regulation §1.409A-3(i)(5)(v), (vi) or (vii). Notwithstanding the foregoing, a termination for Good Reason will only be effective if the Company fails to correct or cure the issue or condition giving rise to the Termination for Good Reason within thirty (30) days of the written notice from the Employee detailing the nature of the breach or infraction.

4.2. Compensation after Termination. Upon the termination of employment of Employee, the Company shall have no further obligation of any kind to Employee under this Agreement except as follows:

(a) The Company shall pay Employee any accrued but unpaid Base Salary or other compensation earned through the date of termination.

(b) Employee shall also be entitled to participate in the Company's employee benefit plans through the date of termination, subject to the provisions of those plans.

(c) If Employee's employment hereunder is voluntarily terminated by the Company pursuant to Section 4.1(e) or Employee validly terminates his employment for Good Reason under Section 4.1(f), the Company shall continue to pay Employee, as severance pay, Employee's Base Salary (prorated and calculated on a weekly basis) for a period of 52 weeks following Employee's date of termination and determined using the Base Salary in effect at the time of Employee's termination. In addition, if Employee's employment hereunder is voluntarily terminated by the Company pursuant to Section 4.1(e) or Employee validly terminates his employment for Good Reason under Section 4.1(f), and if Employee is eligible for and elects COBRA continuation health coverage under the Company's health insurance plan maintained by the Company at the time of Employee's termination of employment, the Company shall pay one hundred percent (100%) of the cost of Employee's COBRA continuation health coverage under the Company's health insurance plan for 52 weeks after Employee's termination of employment or until Employee is no longer eligible for COBRA continuation health coverage under the Company's health insurance plan or applicable law, whichever first occurs.

4.3 Return of Company Property. Prior to the termination date, Employee shall return to the Company all documents, confidential information, equipment, records, files, credit cards, keys and other property of the Company.

4.4 Reconciliation of Compensation Owed Employee. After any termination of Employee's employment hereunder, all compensation and amounts due to Employee with respect to work performed or expenses incurred prior to the date of termination may be offset by any amounts due to the Company

by Employee and Employee authorizes Company to withhold any compensation or other amounts due Employee as necessary to accomplish such offset.

4.5 Employee Cooperation. Following any notice of termination, Employee shall reasonably cooperate with the Company in all matters relating to the winding up of Employee's pending work on behalf of the Company and the orderly transfer of any such pending work to other employees of the Company, and shall make himself reasonably available to the Company to accomplish such winding up and orderly transfer of pending work. Employee further agrees to reasonably cooperate with and provide reasonable assistance to the Company and its legal counsel in connection with any litigation (including arbitration or administrative hearings) or investigation affecting the Company, in which (in the reasonable judgment of the Company) Employee's assistance or cooperation is needed. Employee shall, when reasonably requested by the Company, provide testimony or other assistance and shall travel at the Company's request in order to fulfill this obligation; provided, however, that, in connection with such litigation or investigation, the Company shall attempt to accommodate Employee's schedule, shall provide Employee with reasonable notice in advance of the times in which Employee's cooperation or assistance is needed, and shall reimburse Employee for any reasonable out-of-pocket expenses incurred in connection with such matters.

## ARTICLE 5
## RESTRICTIVE COVENANTS

5.1. Assignment of Inventions. Employee agrees to promptly disclose to the Company all ideas, inventions, discoveries, enhancements and improvements (including, but not limited to, those which are or may be patentable or subject to copyright protection) which Employee makes, originates, creates, conceives or reduces to practice during Employee's employment with the Company and which relate directly or indirectly to the business or products of the Company or to work or investigations done for the Company. All such ideas, inventions, discoveries and improvements (collectively, "*Inventions*"), shall be the sole and exclusive property of the Company and Employee hereby assigns to the Company all rights therein, except as may otherwise be specifically agreed by the Company in writing.

In order that the Company may protect its rights in the Inventions, Employee will make adequate written records of all Inventions, which records shall be the Company's property. Both prior to and after termination of employment with the Company, Employee will, without charge to the Company but at its request and expense, sign all papers, including forms of assignment, and provide any other assistance necessary to transfer or record the transfer of Employee's right, title and interest in and to the Inventions to the Company, or enable the Company to obtain, maintain and enforce patents or copyrights throughout the world. All written records, documents or other tangible property relating in any way to the Inventions that are conceived or generated by Employee or come into Employee's possession during employment shall be and remain the exclusive property of the Company, and Employee agrees to deliver all such records, documents and tangible property to the Company on termination of employment or at such earlier time as the Company may request Employee to do so.

The obligations contained in this Section 5.1 shall continue beyond Employee's termination of employment, whether the Inventions are patentable or copyrightable, so long as they are conceived or made by Employee during the period of employment. Any Invention relating to the business or products of the Company that Employee reduces to writing or upon which Employee files a patent application or for copyright protection within one (1) year after termination of Employee's employment with the Company, shall be presumed to constitute an Invention conceived by Employee during the term of

Case 7:22-cv-00116-FL    Document 1-1    Filed 07/27/22    Page 6 of 12

employment or engagement with the Company, subject to proof to the contrary by good faith, written and duly corroborated records establishing that the Invention was conceived following termination of employment.

Employee irrevocably constitutes and appoints the Company for the period of Employee's employment with the Company, and for one (1) year thereafter, as Employee's attorney-in-fact for the purpose of executing, in Employee's name and on Employee's behalf, such instruments or other documents as may be necessary to transfer, confirm and perfect in the Company the rights Employee has granted to the Company in this Section 5.1.

Notwithstanding the foregoing, and without in any way expanding the scope thereof, this Section 5.1 shall not apply to any Invention that Employee developed entirely on Employee's own time without using the Company's equipment, supplies, facility or Trade Secrets (as defined herein), except for those Inventions that (i) relate to the Company's business or actual or demonstrably anticipated research or development, or (ii) result from any work performed by Employee for the Company.

5.2 <u>Work for Hire; Retention of Ownership by the Company</u>. Employee acknowledges and agrees that any work prepared by Employee on behalf of the Company (including performance of any services for the Company) (the "*Work*") (a) is or has been specially ordered or commissioned; (b) is a contribution to a collective work; and (c) shall be considered "work for hire" under 17 U.S.C. §§ 101, <u>et seq.</u> and all other United States copyright laws. The Work shall be the sole and exclusive property of the Company free and clear from all claims of any nature relating to the contributions and other efforts of Employee, or any principal, employee, agent or contractor engaged by Employee. All right, title and interest (throughout the United States and in all foreign countries) therein shall vest in the Company.

5.3 <u>Covenant of Non-Competition and Non-Solicitation</u>. Employee hereby agrees that, during the term of Employee's employment with the Company and continuing for a period of twelve (12) months following termination of employment, Employee shall not, for any reason whatsoever, directly or indirectly, in an individual or representative capacity:

(a) Work in a Competitive Capacity (as defined herein) for any person, firm, corporation, partnership, limited liability company or other business entity which is in direct competition with the Company and engages in the Company's Business (as defined herein) in the Territory (as defined herein) . "*Business*" shall mean the design, manufacture, marketing and sale of sound machines, safety lights, bedding and bedding accessories, sleep scent devices and oils and any other products which the Company designs, manufactures, markets or sells during Employee's employment and at the termination thereof. "*Territory*" means (1) each state, territory and possession of the United States and (2) each state, territory and province of any other country in the world in which the Company is engaged in the Business. "*Work in a Competitive Capacity*" shall mean (a) working in the same or similar capacity as the capacity in which Employee worked during Employee's last twelve (12) months of employment with the Company or (b) providing the same or similar services as the services which Employee provided during Employee's last twelve (12) months of employment by the Company, regardless of the name of the position or the title. This prohibition on Work in a Competitive Capacity shall apply whether Employee works or provides services as a sole proprietor, employee, consultant, contractor, officer, director, partner, manager or member of any competing business entity. Notwithstanding the foregoing, nothing in this Agreement is intended to prohibit Employee from indirectly or passively having an ownership, membership, partnership, or

equity interest in any privately or publicly-held entity. Employee acknowledges that the Business of the Company is being conducted throughout the Territory including, without limitation, by way of wholesale and retail sales and online sales through the Company's various e-commerce platforms. Employee further acknowledges that this covenant is no more restrictive as to time or territory than necessary to protect the Company's legitimate business interests.

    (b) (i) Solicit or accept any competitive business from any person, company, firm or entity which is or was a customer or prospective customer of the Company at any time during the period of Employee's employment with the Company and with whom Employee had meaningful contact during the term of his employment with the Company, or (ii) in any manner persuade or attempt to persuade any such customer or prospective customer, or any vendor, supplier or contractor, to discontinue or alter its business relationship with the Company or (iii) otherwise interfere with the Company's relationship with any such person, company, firm or entity.

    (c) Solicit, hire or offer to hire any employee, officer or agent of the Company while that person is employed by the Company and for six (6) months after the termination of that person's employment, or otherwise induce or attempt to induce any such employee, officer or agent to discontinue his or her relationship with the Company. This prohibition on solicitation, hiring and offering to hire shall only apply with respect to those employees, officers or agents with whom Employee has material contact during the period of Employee's employment with the Company. This prohibition applies whether Employee seeks to engage such person as an employee or as a consultant or independent contractor.

To the extent that the provisions of this Section 5.3 and its subsections differ from or conflict with the non-competition and non-solicitation covenants set forth in the Company's Operating Agreement in effect from time to time, particularly with respect to the applicable term / time period, the provisions of this Agreement shall control and shall take precedence over any and all similar restrictions contained in the Company's Operating Agreement in effect from time to time.

    5.4 Confidential Information. As used herein, the term "*Confidential Information*" shall mean any information proprietary to the Company and not generally known, including without limitation Trade Secrets (as defined herein), Inventions (as defined herein), technology whether now known or hereafter discovered, and information pertaining to research, development, techniques, engineering, purchasing, marketing, selling, accounting, licensing, know-how, processes, products, equipment, devices, models, prototypes, computer hardware, computer programs and flow charts, program code, software libraries, databases, formulae, compositions, discoveries, cost systems, financial information, personnel information, customer lists, customer histories and records, suppliers, contacts and referral sources, and any lists of names, phone numbers, and addresses of those sources, the particular needs and requirements of customers, the identity of customers and potential customers, lists of customers' and potential customers' names, addresses, and phone numbers, and pending business transactions and shall also include confidential and proprietary information of customers and other third parties received by the Company. Information may be deemed Confidential Information regardless of its source, and all information designated or treated as Confidential Information by the Company shall conclusively be deemed Confidential Information for all purposes.

    The term Confidential Information shall not apply to the following: (i) information that is or becomes public knowledge other than through the fault of Employee; (ii) information that is received by Employee from a third party who is under no obligation to keep the information confidential; (iii)

information that Employee can show by written records or other tangible evidence was in Employee's possession prior to the date of disclosure by the Company to Employee of the Confidential Information in question; or (iv) information which is individually developed by Employee, and which Employee can show by written or other tangible evidence was independently developed without the benefit of any Company resources or information. The burden of proving the foregoing exceptions shall be on Employee.

As used herein, the term "***Trade Secret***" shall mean information of the Company, including but not limited to, a formula, pattern, compilation, program, device, method, technique, process, drawing, cost data or customer list, that: (i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Employee shall, during the course of Employee's employment and at all times subsequent to Employee's employment, hold in strictest and total confidence all Confidential Information. Employee will at no time, without prior written authorization by the Company (or except pursuant to a confidentiality agreement entered into by the Company in its ordinary course of business), disclose, assign, transfer, convey, communicate, or use for the benefit of any person or entity other than the Company any Confidential Information, nor shall Employee permit any other person or entity to use Confidential Information in competition with the Company.

5.5     Enforcement. Employee acknowledges that the restrictions in this Article 5 are fair and reasonable for the purpose of preserving the goodwill, proprietary rights and going concern value of the Company. Employee further acknowledges that the Company shall have the right to enforce the restrictions in this Article 5 in whole or in part, without waiver. In the event a final determination is made by a court of competent jurisdiction that the time or any other restriction contained in this Article 5 is an unenforceable restriction against Employee, the provisions of this Article 5 shall not be rendered void but shall be deemed divisible and amended or modified to apply as to such maximum time (with each month of the specified period being deemed a separate period of time and each state, territory, possession or province deemed a separate geographic area) and to such other maximum extent as such court may judicially determine to be enforceable. In addition, Employee agrees that the Company may, at its option, seek to enforce the restrictions in this Article 5 as to any lesser time period, activity, or geographic area which it deems appropriate. Employee shall provide the Company, upon request from time to time, a written statement detailing Employee's employer, job description and employer address so as to enable the Company to monitor Employee's compliance with this Article 5.

5.6     Remedies. Employee acknowledges and agrees that if Employee breaches or threatens to breach any of the terms of the covenants set forth in this Article 5 (the "***Restrictive Covenants***") the Company will have no adequate remedy at law. Accordingly, Employee agrees that in the event Employee breaches or threatens to breach any of the Restrictive Covenants, the Company shall be entitled to immediate temporary injunctive and other equitable relief, without bond and without the necessity of showing actual monetary damages, subject to hearing as soon thereafter as possible. Nothing contained herein shall be construed as prohibiting the Company from pursuing any other remedies available to it for such breach or the threat of such a breach by Employee, including the recovery of any damages that it is able to prove.

5.7     Effect of Termination.  The provisions of this Article 5 shall survive termination of employment of Employee or any termination of this Agreement, and the same shall be enforceable against Employee regardless of the basis of Employee's termination.  The existence of a claim by Employee against the Company shall not constitute a defense to enforcement.

5.8     Affiliates and Subsidiaries.  All references in this Article 5 to the "Company" shall be deemed to refer to and include the Company, the Company's parent, subsidiaries and affiliates and all transferees, assignees or successors-in-interest to any of the foregoing.

## ARTICLE 6
## INTENTIONALLY OMITTED

## ARTICLE 7
## MISCELLANEOUS

7.1     Relationship Between the Parties.  The parties recognize that the Managers shall manage the business affairs of the Company. The relationship between the Company and Employee is that of employer and employee.

7.2     Entire Agreement.  This Agreement contains the entire understanding of the parties and supersedes all prior agreements, arrangements or understandings, whether written or oral, including without limitation, the Prior Employment Agreement.  Neither party has made any representations to induce the other to enter into this Agreement except as set forth in writing in this Agreement.

7.3     Modification of Agreement.  This Agreement may not be modified or amended except in a writing signed by both parties to this Agreement.

7.4     Waiver of Breach.  The Company's waiver of any breach of this Agreement by Employee shall not operate or be construed as a waiver of any subsequent breach by Employee.  No waiver shall be valid unless in writing and signed by an authorized officer of the Company.

7.5     Assignment.  Employee acknowledges that the services to be rendered by Employee are unique and personal.  Accordingly, Employee may not assign any of Employee's rights or delegate any of Employee's duties or obligations under this Agreement.

7.6     Notices. All notices, demands or other communications to be given under this Agreement shall be in writing and shall be deemed given on the date delivered if delivered personally, on the business day after the date sent if sent by overnight commercial delivery or local courier, on the second business day after the date of dispatch if mailed by local registered mail (return receipt requested) or on the third business day after the date of dispatch if mailed by overseas courier or on the date transmitted if sent via facsimile or other electronic means (with confirmation of receipt). Such notices, demands and other communications shall be sent to the address set forth opposite each party's signature, or to such other address as specified by the parties.

7.7     Binding Effect.  This Agreement shall inure to the benefit of and shall be binding upon the parties hereto and their respective heirs, legal representatives, successors, and permitted assigns.

7.8     Section 409A.  This Agreement and the payments hereunder are intended to comply with Section 409A of the Code and the Treasury regulations and other interpretive guidance issued thereunder (collectively, "*Section 409A*") and shall be construed and administered in accordance with such intent. For purposes of Section 409A, each payment provided under this Agreement shall be treated as a separate payment. To the extent required under Section 409A, any payments to be made under this Agreement in connection with a termination of employment shall only be made if such termination constitutes a "separation from service" under Section 409A. Notwithstanding the foregoing, the Company makes no representations that the payments and benefits provided under this Agreement comply with Section 409A and in no event shall the Company be liable for all or any portion of any taxes, penalties, interest, or other expenses that may be incurred by Employee on account of non-compliance with Section 409A.

7.9     Governing Law; Choice of Forum.  This Agreement shall be governed by and construed under the laws of the State of North Carolina, and venue for the litigation of any disputes arising hereunder shall be with the Superior Court for New Hanover County, North Carolina.  Employee consents to the jurisdiction of such court and waives any objection relating to personal jurisdiction or to venue in said court.

7.10    Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which taken together shall constitute one and the same instrument.  An electronic copy of a signature of either party shall have the same force and effect as an original signature and an electronically transmitted or stored copy of this Agreement shall have the same force and effect as the original.

**[NEXT PAGE IS SIGNATURE PAGE]**

**IN WITNESS WHEREOF,** the parties have duly executed this Agreement on the day and year first above written.

NOTICE ADDRESS:
3603 Marcae CT
Austin TX 78704

Email:daryl@yogasleep.com

EMPLOYEE:

_____(SEAL)
Daryl Millar

NOTICE ADDRESS:
2015 Capital Drive
Wilmington, NC 28405
Email: jimmy@yogasleep.com

MARPAC, LLC

By:_____
Name: James B. Sloan, Jr.
Title: CEO/President

*Signature Page*