# MEMBERSHIP AWARD AGREEMENT

THIS MEMBERSHIP AWARD AGREEMENT (this "Agreement") is made effective as of January 1, 2021, by and between **MARPAC, LLC**, a North Carolina limited liability company (the "Company"), and **DM CONSULTING PARTNERS, LLC**, a Texas limited liability company (the "Owner"), of which Daryl Millar (the "Employee") is the sole member.

A. The Company and the Employee entered a new Employment Agreement dated as of January 1, 2021 (the "Employment Agreement"), pursuant to which the Employee continues to be employed as a key member of the Company's management team.

B. The Company believes that the potential for additional ownership in the Company by the Owner will provide the Employee a strong incentive to put forth maximum effort for the continued success and growth of the Company; and

C. Provided that the Employee satisfies certain conditions as set forth in this Agreement, the Company desires to grant to the Owner a "profits interest" in the Company within the meaning of Revenue Procedure 93-27, as modified by Revenue Procedure 2001-43.

NOW, THEREFORE, in consideration of the mutual covenants hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto have agreed, and do hereby agree as follows:

1. **Grant of Ownership Interest.** Effective as of January 1, 2021 (the "Grant Date"), the Company grants and awards to the Owner a three percent (3.00%) Ownership Interest (as defined in the Company's Third Restatement of Operating Agreement dated as of June 14, 2019, as heretofore or hereafter amended and/or restated from time to time (the "LLC Agreement")) in the Company (the "Interest"). It is the intent of the parties that the grant of the Interest shall constitute a "profits interest" in the Company. Accordingly, the Owner acknowledges and agrees that (a) as of the Grant Date, the Owner's initial Capital Account balance with respect to the Interest granted to it pursuant to this Agreement shall be zero dollars ($0.00), and (b) the Owner shall not share in the fair market value of the Company's equity as of the Grant Date with respect to the Interest granted to it pursuant to this Agreement. The Managers of the Company have determined that the fair market value of the Company's equity as of the Grant Date is $16,000,000.00 (the "Equity FMV"), and therefore effective immediately preceding the Grant Date the Managers have adjusted the Capital Accounts of the Company's Members other than Owner to reflect the Equity FMV of the Company.

2. **Management Member.** Owner previously has joined as a party to the LLC Agreement, and has been admitted as a Member in the Company. The Owner shall have the rights, benefits, restrictions, obligations and other privileges of a Member with respect to the Interest as provided in the LLC Agreement, subject to the provisions of this Agreement. The Owner understands that it is and will be classified as a "Management Member" of the Company under the LLC Agreement.

3. **Taxes.** The Company shall have the right to deduct, from any amounts payable now or any time thereafter to the Owner, the amount of any taxes which the Company is required by law

301835

to withhold, as and when required by law, with respect to the Owner's receipt and/or ownership of the Interest.

4. **Vesting of Interest**.

(a) One-third of the entire Interest (i.e., a 1.0% Ownership Interest) shall vest immediately as of the Grant Date, and the remainder of the Interest shall be unvested.

(b) If the Company achieves Performance Milestone #1 (defined below) on or before December 31, 2023, then one-third of the entire Interest (i.e., a 1.00% Ownership Interest in the Company) shall vest effective as of the last day of the calendar year in which achievement of Performance Milestone #1 occurs. In the event that Performance Milestone #1 has not been achieved by the Company on or before December 31, 2023, then fifty percent (50%) of the entire Interest (i.e., a 1.00% Ownership Interest in the Company) shall be and remain unvested and, if not sooner purchased pursuant to Section 5, shall be repurchased by the Company (the "First Repurchase") at the price and upon the other terms provided in Section 5. In the event of a First Repurchase, the closing of the First Repurchase (the "First Repurchase Closing") shall occur on a date selected by the Company no later than April 30, 2024, and the First Repurchase Closing shall be effective as of January 1, 2024.

(c) If the Company achieves Performance Milestone #2 (defined below) on or before December 31, 2025, then one-third of the entire Interest (i.e., a 1.00% Ownership Interest in the Company) shall vest effective as of the last day of the calendar year in which achievement of Performance Milestone #2 occurs. In the event that Performance Milestone #2 has not been achieved by the Company on or before December 31, 2025, then fifty percent (50%) of the entire Interest (i.e., a 1.00% Ownership Interest in the Company) shall be and remain unvested and, if not sooner purchased pursuant to Section 5, shall be repurchased by the Company (the "Second Repurchase") at the price and upon the other terms provided in Section 5. In the event of a Second Repurchase, the closing of the Second Repurchase (the "Second Repurchase Closing") shall occur on a date selected by the Company no later than April 30, 2026 and the Second Repurchase Closing shall be effective as of January 1, 2026.

(d) No portion of the Interest shall vest after (A) the happening of a Buy-Sell Event with respect to the Owner, or (B) termination of Employee's employment with the Company for any or no reason. Prior to vesting, the unvested portion of the Interest may be referred to as the "Unvested Portion" and the vested portion of the Interest may be referred to as the "Vested Portion".

(e) "Performance Milestone #1" means the Company's EBITDA (as defined in Schedule 1 attached hereto) equals or exceeds $5,000,000 during any of the calendar years ending December 31, 2021, December 31, 2022 or December 31, 2023. "Performance Milestone #2" means the Company's EBITDA (as defined in Schedule 1 attached hereto) equals or exceeds $7,500,000 during any of the calendar years ending December 31, 2021 through and including December 31, 2025.

(f) The calculation of EBITDA and achievement of Performance Milestone #1 and/or Performance Milestone #2 shall be determined by the Managers of the Company, and the determination by the Managers shall be final and binding on Owner and Employee.

(g) Notwithstanding the foregoing, the entire Interest shall vest on the day immediately prior to the closing of a Sale Transaction involving the Company, provided that: (1) Owner remains a Member of the Company through the date of the closing of such Sale Transaction; and (2) no Unvested Portion of the Interest shall vest if and to the extent such Unvested Portion is or becomes, prior to the closing of the Sale Transaction, subject to an obligation of purchase and sale under Section 5.

5. **Repurchase of Unvested Portion of Interest.** Upon the first to occur of (a) the happening of a Buy-Sell Event with respect to the Owner, (b) the termination of Employee's employment with the Company for any or no reason or (c) the First Repurchase Closing or the Second Repurchase Closing, as applicable, the Company shall repurchase from the Owner, and the Owner shall sell to the Company, the Unvested Portion, if any, at a purchase price equal to that portion of the Capital Account Balance (defined below) attributed to the Unvested Portion. The closing of the repurchase of the Unvested Portion shall occur in Wilmington, North Carolina (1) on a date selected by the Company within one hundred twenty (120) days after (A) the happening of the Buy-Sell Event, or (B) termination of employment of Employee, or (2) on the date set for the First Repurchase Closing or the Second Repurchase Closing, as applicable, under Section 4, and the purchase price shall be paid in cash or with other immediately available funds at closing against transfer and assignment of the Unvested Portion of the Interest by the Owner to the Company.

For purposes of this Agreement, "Capital Account Balance" (A) shall mean the balance in the Capital Account of Owner, as maintained for U.S. Federal income tax purposes and without any restatement or adjustment to the value of the Company or its assets; and (B) shall be determined by the Company's accounting firm as of (1) the end of the calendar month immediately preceding the month in which the Buy-Sell Event or termination of employment occurs, (2) January 1, 2024, for any Unvested Portion acquired as part of the First Repurchase, and (3) January 1, 2026, for any Unvested Portion acquired as part of the Second Repurchase.

6. **Repurchase of Vested Portion of Interest.** Upon the happening of a Buy-Sell Event with respect to the Owner, or upon termination of Employee's employment with the Company for any or no reason, the Vested Portion, if any, shall be subject to repurchase by the Company upon the following terms and conditions:

(a) If Employee's employment with the Company is terminated "for cause" (as defined in the Employment Agreement), then the Company shall repurchase from the Owner, and the Owner shall sell to the Company, all of the Vested Portion at a purchase price equal to that portion of the Capital Account Balance attributed to the Vested Portion. The closing of the repurchase of the Vested Portion shall occur in Wilmington, North Carolina within sixty (60) days of such termination of employment, and the purchase price shall be paid in cash or with other immediately available funds at closing against transfer and assignment of the Vested Portion of the Interest by the Owner to the Company.

(b) If Employee's employment with the Company is terminated other than "for cause" (as defined in the Employment Agreement) or upon the happening of any other Buy-Sell Event with respect to the Owner, then the Company thereafter shall have a continuing option to repurchase the Vested Portion (the "Call Option") at a purchase price (the "Call Price") determined in accordance

with Schedule 1 attached hereto. Upon becoming exercisable, the Call Option may be exercised at any time by the Company by giving ten (10) days written notice of exercise (the "Call Notice") to the Owner. Upon exercise of the Call Option, (A) the Company shall repurchase from the Owner, and the Owner shall sell to the Company, all of the Vested Portion at the Call Price, (B) the closing of the repurchase of the Vested Portion shall occur in Wilmington, North Carolina within sixty (60) days after exercise of the Call Option; and (C) the Call Price shall be paid in cash or with other immediately available funds at closing against transfer and assignment of the Vested Portion by the Owner to the Company. To the extent that this Section 6(b) conflicts with any provision(s) of the LLC Agreement, this section shall control.

7. **Special Distribution and Allocation of Profit upon Closing of Sale Transaction.** If a Sale Transaction involving the Company closes and the Net Transaction Value with respect to such Sale Transaction exceeds $75,000,000, then, provided that the Owner holds an Ownership Interest in the Company as of such closing, the Owner shall be entitled to the Special Distribution defined in this Section 7. In connection with the closing of such a Sale Transaction, the Owner shall receive a special cash distribution (the "Special Distribution") equal to the product of (A) and (B), where (A) equals two percent (2%) and (B) equals (x) the Net Transaction Value *less* (y) the Equity FMV. The Special Distribution shall be conditioned upon the closing of the Sale Transaction and shall be paid contemporaneously with such closing, subject to such holdbacks or other adjustments as may be made by the Managers to provide for post-closing adjustment to the transaction consideration. For the Fiscal Year in which the Sale Transaction occurs, items of income, expense, gain and loss comprising Profit or Loss of the Company shall be specially allocated to the Owner, in a manner reasonably determined by the Managers, to take into account the Special Distribution being made to the Owner and in order to comply with the capital account maintenance requirements of § 704(b) of the Code. "Net Transaction Value" means the net cash consideration (after payment or reservation for payment and satisfaction of all debts and liabilities of the Company and after reduction for actual transactional expenses incurred in connection with the Sale Transaction) to be received by the holders of Ownership Interests of the Company in connection with a Sale Transaction involving a purchase transaction, reorganization, merger or consolidation, or the net cash consideration (after payment and satisfaction of all debts and liabilities of the Company and after reduction for actual transactional expenses incurred in connection with the Sale Transaction) to be distributed to the holders of the Ownership Interests of the Company upon a sale of assets or dissolution and liquidation of the Company. In the event a Sale Transaction involves receipt by the holders of the Ownership Interests of the Company of consideration consisting of securities or property other than cash, then no value shall be assigned to such non-cash consideration nor shall such non-cash consideration be taken into account in the calculation of the Net Transaction Value. In addition, any deferred but non-contingent consideration (for example, the portion of the purchase price reflected in a seller promissory note) shall be included in the calculation of the Net Transaction Value but any earn-out amounts or other contingent consideration shall be excluded from and disregarded in the calculation of the Net Transaction Value. The Net Transaction Value shall be determined in good faith by the Managers of the Company and such determination shall be final and binding on the Owner.

8. **Representations, Warranties and Acknowledgments of Owner.** The Owner represents and warrants to the Company and acknowledges to the Company that:

(a) The Owner acknowledges that: (i) none of the Company, its Managers, or any of the Company's or the Managers' respective affiliates, officers, employees, agents or representatives (each, a "Related Person") has provided or is providing the Owner with tax advice regarding the receipt and ownership of the Interest or any other matter, and the Company has urged the Owner to consult the Owner's own tax advisor with respect to the income taxation consequences of receiving, holding and disposing of the Interest; and (ii) that the Company will have no liability to the Owner if the grant of the Interest does not, in fact, constitute a "profits interest" within the meaning of Revenue Procedure 93-27, as modified by Revenue Procedure 2001-43.

(b) The Owner also acknowledges that none of the Company, the Managers, or any Related Person has made any representation or warranty, express or implied, as to the future performance of the Company or the present or future value of the Interest. The Owner further acknowledges that: (i) all forecasts, projections or illustrations of amounts that might be realized as a result of the Interest that the Company, the Managers, or a Related Person shared with the Owner (collectively, "Illustrations"), if any, were purely hypothetical; and (ii) none of the Company, the Managers, or any Related Person intended for the Owner to rely upon such Illustrations in the process of deciding to enter into this Agreement or accept an award of the Interest.

(c) The Owner is duly organized, validly existing and in good standing under the laws of Texas, with full power to carry on its business as and where such properties and assets are now owned or leased and such business is now conducted.

(d) The Owner has full power, authority and capacity to execute and deliver this Agreement and to perform all of its obligations hereunder. This Agreement has been duly authorized, executed and delivered by the Owner, and, upon due execution and delivery by the Company, this Agreement shall be the valid and legally binding obligation of the Owner and enforceable against it in accordance with its terms.

(e) The Interest to be acquired by the Owner pursuant to this Agreement will be acquired for investment for the Owner's own account, not as a nominee or agent, and not with a view to the sale or distribution of any part thereof, and the Owner has no present intention of selling, granting participation in, or otherwise distributing the same. The Owner is not party to any contract, undertaking, agreement, or arrangement with any person to sell, transfer or grant participations to such person, or to any third person, with respect to the Interest to be acquired by the Owner.

(f) Owner represents and warrants that: (i) it is an "accredited investor" as such term is defined in Rule 501 promulgated under the Securities Act of 1933, as amended, or applicable state securities laws (the "Securities Laws"); (ii) its financial situation is such that it can afford to bear the economic risk of holding the Interest acquired by it for an indefinite period of time and suffer a complete loss of its investment in the Interest; (iii) its knowledge and experience in financial and business matters are such that it is capable of evaluating the merits and risks of its acquisition of the Interest as contemplated by this Agreement; (iv) it understands that its acquisition of the Interest is a speculative investment; and (v) it has had

Case 7:22-cv-00116-FL    Document 1-2    Filed 07/27/22    Page 5 of 10

an opportunity to ask questions and receive answers from the Company and its Managers regarding the terms and conditions of the issuance of the Interest.

(g) The Owner understands that the Interest has not been and will not be registered under the Securities Laws on the grounds that the sale provided for in this Agreement and the issuance of the Interest pursuant to this Agreement is exempt from registration under the Securities Laws, and that the reliance by the Company on such exemption is predicated in part on the Owner's representations and warranties set forth in this Agreement. The Owner understands that the Interest to be acquired by the Owner pursuant to this Agreement may not be sold, transferred or otherwise disposed of without registration under the Securities Laws or an exemption therefrom, and that in the absence of an effective registration statement covering the Interest or an available exemption from registration under the Securities Laws, the Interest must be held indefinitely.

(h) Owner understands that each instrument and certificate representing the Interest will be endorsed with a legend substantially as follows (in addition to any other applicable legends):

> **THE TRANSFER OF THE OWNERSHIP INTEREST EVIDENCED BY THIS CERTIFICATE IS RESTRICTED AND SUCH TRANSFER MAY NOT BE EFFECTED EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF THE COMPANY'S OPERATING AGREEMENT. THE BENEFITS, RIGHTS, PRIVILEGES AND OBLIGATIONS OF THE OWNERSHIP INTEREST ARE SUBJECT TO ALL OF THE TERMS, CONDITIONS AND RESTRICTIONS SET FORTH IN THE OPERATING AGREEMENT. THE PERCENTAGE INTEREST REPRESENTED HEREBY MAY BE CHANGED FROM TIME TO TIME BY ANY SUBSEQUENT CHANGES IN THE OWNERSHIP INTERESTS OF THE COMPANY.**
>
> **THE OWNERSHIP INTEREST REPRESENTED BY THIS CERTIFICATE HAS NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE NORTH CAROLINA SECURITIES ACT OR SIMILAR ACTS OR LAWS OF OTHER STATES IN RELIANCE UPON EXEMPTIONS UNDER THOSE ACTS AND LAWS. THE SALE OR OTHER DISPOSITION OF THE OWNERSHIP INTEREST IS RESTRICTED AS STATED IN THE OPERATING AGREEMENT, AND IN ANY EVENT IS PROHIBITED UNLESS THE COMPANY, AT ITS OPTION, RECEIVES AN OPINION OF COUNSEL SATISFACTORY TO IT AND ITS COUNSEL THAT SUCH SALE OR OTHER DISPOSITION CAN BE MADE WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND ANY APPLICABLE STATE SECURITIES ACTS AND LAWS. BY ACQUIRING THE OWNERSHIP INTEREST, THE INTEREST OWNER REPRESENTS THAT IT WILL NOT SELL OR**

301835

6

Case 7:22-cv-00116-FL    Document 1-2    Filed 07/27/22    Page 6 of 10

OTHERWISE DISPOSE OF ITS OWNERSHIP INTEREST WITHOUT REGISTRATION AND COMPLIANCE WITH THE AFORESAID ACTS AND THE RULES AND REGULATIONS ISSUED THEREUNDER.

9. **Representations, Warranties and Acknowledgments of the Company.** The Company represents and warrants to the Owner and acknowledges to the Owner that:

(a) The Company is duly organized, validly existing and in good standing under the laws of North Carolina, with full power to carry on its business as and where such properties and assets are now owned or leased and such business is now conducted.

(b) The Company has full power, authority and capacity to execute and deliver this Agreement and to perform all of its obligations hereunder. This Agreement has been duly authorized, executed and delivered by the Company, and, upon due execution and delivery by the Owner, this Agreement shall be the valid and legally binding obligation of the Company and enforceable against it in accordance with its terms.

10. **Invalidity of Provisions**. The invalidity or unenforceability of any provision of this Agreement as a result of a violation of any state or federal law, or of the rules or regulations of any governmental regulatory body, or any securities exchange shall not affect the validity or enforceability of the remainder of this Agreement.

11. **Waiver and Modification**. The provisions of this Agreement may not be waived or modified, unless such waiver or modification is in writing and signed by the parties hereto.

12. **Interpretation**. All decisions or interpretations made by the Company's Managers with regard to any question arising under this Agreement shall be binding and conclusive on the Company and the Owner.

13. **Multiple Counterparts**. This Agreement may be signed in multiple counterparts, all of which when taken together shall constitute an original agreement. The execution by one party of any counterpart shall be sufficient execution by that party, whether or not the same counterpart has been executed by any other party.

14. **Incorporation of Defined Terms.** Any capitalized terms not defined herein shall have the meanings ascribed to them in the LLC Agreement.

15. **Entire Agreement.** The parties agree that this Agreement and the LLC Agreement contain the entire understanding of the parties and supersede any prior understandings and agreements between them with respect to the Interest subject to this Agreement. Neither party has made any representations to induce the other to enter into this Agreement except as set forth in writing in this Agreement.

16. **Governing Law; Venue for Disputes**. This Agreement shall be governed by and construed under the laws of the State of North Carolina, and venue for the litigation of any disputes arising hereunder shall be with the Superior Court for New Hanover County, North Carolina. The Owner consents to the jurisdiction of such court and waives any objection relating to personal jurisdiction or to venue in said court.

17. **Assignment.** The Owner acknowledges that the Owner may not assign this Agreement, in whole or in part, or any of its rights, benefits or privileges under this Agreement, without the prior written consent of the Company.

18. **Notices.** All notices, demands or other communications to be given under this Agreement shall be in writing and shall be deemed given (a) on the date delivered if delivered personally, (b) on the next business day after the date sent, if sent by overnight commercial delivery or local courier or via facsimile or other electronic means (with confirmation of receipt), (c) on the second business day after the date of dispatch, if mailed by local registered mail (return receipt requested), or (d) on the third business day after the date of dispatch if mailed by overseas courier. Such notices, demands and other communications shall be sent to the address set forth opposite each party's signature, or to such other address as specified by the parties.

19. **Binding Effect.** This Agreement shall inure to the benefit of and shall be binding upon the parties hereto and their respective heirs, legal representatives, successors, and permitted assigns.

[NEXT PAGE IS SIGNATURE PAGE]

IN WITNESS WHEREOF, the Owner and the Company have caused this Agreement to be duly executed, all as of the day and year first above written.

NOTICE ADDRESS:

3603 Marcae CT
Austin, TX 78704
Email: daryl@yogasleep.com

DM CONSULTING PARTNERS, LLC

By: *(signed)* Daryl Millar
Name: Daryl Millar
Title: Managing Member

NOTICE ADDRESS:

2015 Capital Drive
Wilmington, NC 28405
Email: jimmy@yogasleep.com

MARPAC, LLC

By: *(signed)*
Name: James B. Sloan, Jr.
Title: President

Pursuant to Section 8.6 of the LLC Agreement, the Company may not issue additional Ownership Interests to any person without the consent of the Managers. Accordingly, the Managers sign below to evidence their approval of such issuance and admission with respect to the Interest.

*(signed)*
James B. Sloan, Jr.

BEING ALL OF THE MANAGERS

[Signature Page – 2021 Membership Award Agreement – DM Consulting Partners, LLC]

Case 7:22-cv-00116-FL   Document 1-2   Filed 07/27/22   Page 9 of 10

# SCHEDULE 1
# TO
# MEMBERSHIP AWARD AGREEMENT

## CALL PRICE

The Call Price of the Vested Portion of the Owner shall be equal to the product of (A) and (B), where (A) represents the percentage Ownership Interest that the Vested Portion represents; and where (B) equals the Equity Value (defined below) of the Company as of the relevant date of determination set forth below.

For purposes of this Agreement and the determination of the Call Price in accordance with this Schedule 1, the following definitions shall be applicable:

"Equity Value" means the sum of (1) the most recent annual valuation of the Company as a going concern (which may be based on a multiple of EBITDA) determined on a cash-free, debt-free basis by an independent, qualified business appraiser or appraisal firm selected by the Company, the cost of which appraisal shall be paid by the Company, *plus* (2) the Company's cash on hand as of the date of the Call Notice, *minus* (3) the Equity FMV, which represents the baseline value of the Company as of the Grant Date, and *minus* (4) all outstanding debts, liabilities and obligations of the Company reflected on its books and records as of the date of the Call Notice.

"EBITDA" means, for any period of determination, the sum of the Company's: (1) net income (or loss) for such period; *plus* (2) amounts considered in computing net income (or loss) for or during such period for (a) Interest Expense, (b) federal, state and local income taxes, and (c) depreciation and amortization; *plus* (3) losses from the sale of assets outside the ordinary course of the Company's business for such period; *minus* (4) gains from the sale of assets outside the ordinary course of the Company's business for such period; *plus* (5) other non-recurring or extraordinary expenses or losses for such period; *minus* (6) other non-recurring or extraordinary revenue or gains for such period.

"Interest Expense" means, for any period, an amount equal to all interest in respect of all debts, liabilities and obligations of the Company accrued or capitalized during such period (whether or not actually paid during such period).

301835